538 A.2d 16

**Joseph F. CERVONE and Cheryl A. Cervone, His Wife**

v.

**Michael A. READING and Schwans Sales Enterprises**

v.

**Joseph F. CERVONE, Appellant.**

**Joseph F. CERVONE and Cheryl A. Cervone, His Wife**

v.

**Michael A. READING and Schwans Sales Enterprises, Appellants,**

v.

**Joseph F. CERVONE.**

Superior Court of Pennsylvania.

Argued Sept. 2, 1987.

Filed Jan. 12, 1988.

Reargument Denied March 2, 1988.

280

T. Warren Jones, Erie, for Cervone, appellant in No. 1478 and appellee in No. 1569.

Yolanda G. Barco, Meadville, for Cervone, appellees in Nos. 1478 and 1569.

William C. Wagner, Erie, for Reading, appellees in No. 1478 and appellants in No. 1569.

Before BROSKY, TAMILIA and KELLY, JJ.

TAMILIA, Judge:

Appellants, Michael A. Reading (Reading), Schwan's Sales Enterprises, Inc. (Schwan's) and Joseph F. Cervone, appeal from the judgment entered following the October 6, 1986 Order of the trial court which denied all motions for post-trial relief.

Procedurally, the history surrounding the appeal is as follows: Joseph F. Cervone was operating a motorcycle on July 26, 1980, which was involved in a collision with a truck owned by Schwan's and operated by Reading. Cervone's passenger, his wife, Cheryl A. Cervone, sustained leg injuries. On June 18, 1981, the Cervones filed a summons in trespass against Reading and Schwan's, and later, on January 18, 1982, the Cervones filed a complaint against Reading and Schwan's seeking damages for Mrs. Cervone's injuries. Schwan's and Reading filed an answer and counterclaim on February 9, 1982, which denied the allegations of the complaint, and joined Joseph F. Cervone as an additional defendant. The cases were consolidated and went to trial before a jury on February 11, 1985. On February 14, 1985, the jury rendered a verdict in the amount of $600,000 in favor of Cheryl A. Cervone. The jury found Cheryl A. Cervone was not negligent, her husband was 80 per cent negligent and Reading was 20 per cent negligent.

Joseph F. Cervone filed a timely motion for new trial on February 25, 1985. Reading and Schwan's filed a motion for post-trial relief on March 4, 1985, which requested a new trial on the issue of damages.[1] Joseph F. Cervone filed a supplemental motion for post-trial relief on August 6, 1985. On October 6, 1985, the trial court entered the Order in question, denying all motions for post-trial relief. Additional defendant Joseph F. Cervone and the original defendants, Reading and Schwan's, filed separate appeals which have been consolidated.

The facts of the case are as follows. On July 26, 1980, the Cervones were traveling north on Route 19 en route to Edinboro, Pennsylvania, when their motorcycle collided with a delivery truck owned by Schwan's and operated by Reading. Appellant Cervone admits in his brief at No. 1478 Pittsburgh, 1986, that the collision occurred in a two-lane section of that highway which was marked with a double yellow line but was not designated by any signs as a "no passing zone" at that time. Reading had pulled off to the side of the road to make a delivery to a customer, and he then reentered the north bound lane. Cervone, who observed the truck's reentry to the north bound lane, attempted to go around the truck. Cervone testified he crossed the yellow lines and continued to travel about two feet west of the western most yellow line when the truck decided to make a left turn so it could make its next delivery. At that point, the truck and the motorcycle collided and appellee's leg was severely injured upon impact with the truck. Reading testified he did not see the motorcycle until after the impact.

## I. LIABILITY

The trial court notes in its Opinion there were a number of factual disputes going to the matter of liability which had to be resolved by the jury; for instance, whether the truck

1. *See* Pa.R.C.P. 227.1(c), which provides:
 If a party has filed a timely post-trial motion, any other party may file a post-trial motion within ten days after the filing of the first post-trial motion.

suddenly pulled out from the private drive onto the highway or whether there had been ample time for appellant Cervone to have seen it and, also, whether appellant Cervone was negligent in attempting to pass or whether Cervone had, rather, been forced to move over by the truck's sudden entry to the roadway.

■ On appeal, Cervone argues the court erred in charging the jury with respect to the no-passing zone law, 75 Pa.C.S.A. § 3307, because 1) absent the statutorily required signs, a no-passing zone did not exist and 2) even if § 3307 had been violated, the section was not enacted to protect against the type of harm which resulted. We find the jury instruction was proper. The jury was not instructed that if they determined Cervone was passing the truck in a no-passing zone at the time of the accident that they should find him liable. To the contrary, the judge stressed that the crossing of the double yellow lines would not be negligence per se. He said:

I read that only because of another section that sort of ties in, which says in addition to those things, the intersections where you're not supposed to pass on the crest of a hill and curve, and so on, and so forth, the Department, meaning the Department of Transportation, may determine those portions of any highway where overtaking and passing or driving on the left side of the roadway would be especially hazardous and shall by appropriate signs or markings on the roadway indicate the beginning and end of such zones and when the signs or markings are clear and visible to an ordinary and observant person, every driver of a vehicle shall obey the directions of the signs or markings.

Now I explain that to you for two reasons. Number one is sort of a negative. You will recall that in the tape you saw of the scene, there are some "No Passing" signs. But you will also recall that everybody agrees they weren't there in July of 1980. So do not assume from those signs that are there now or were there last fall when that tape was taken because everyone agrees they were not there at that time.

Now we have also had testimony that there was a double yellow line on the highway there. And there is sometimes some confusion over the meaning of a double yellow line. The regulations of the Department of Transportation say that a double yellow line is intended to indicate that that's a place where it's not safe to pass. But the cases have said that it's not a violation of the statute, so that it's not negligence per se to cross a yellow line unless these other things exist. In other words, if there's a yellow line and there's also a curve, a hill or an intersection where you're not allowed to pass, then it's against the law to cross that line. But sometimes there are yellow lines simply in sort of an advisory capacity and it is not a violation of the statute per se to cross that. It is not negligence per se, but it is a factor that you can take into consideration; the fact that there were yellow lines there.

I guess what I'm saying is a person couldn't be arrested and fined for crossing a double yellow line unless one of the other factors—There were no passing zones, hatch marks on the road like they sometimes paint or an intersection or the crest of a hill, or something else. But that doesn't mean that the double yellow line doesn't mean anything. It just means that is itself not negligence per se and you may take into consideration the existence of a double yellow line in overall determining the negligence of any party.

Jury charge, 2/14/85, pp. 16–18.

While appellant Cervone's argument as to the necessity of no-passing signs under § 3307 might have merit had he been cited for violating the section, that was not the case here. *See Commonwealth v. Yorty*, 11 D. & C.3d 206 (1979). The jury was called upon to make a factual determination as to whether Cervone was passing at all, and the judge noted this in his instruction. Thus, whether Cervone had attempted to pass the truck in the face of double yellow lines advising that the area was not safe for passing and whether Cervone was negligent in disregarding the lines were questions properly before the jury. In fact, Cervone,

himself, admitted at trial that double yellow lines on the road had indicated "no passing" to him (T.T., 1/22/85, p. 49). He maintained, however, he had not been attempting to pass. As such, we find no error in the court's instruction on this matter.

Cervone next argues the trial judge erred in instructing the jury on the assured clear distance rule. We disagree, since the evidence in this case conflicted as to whether the truck did or did not suddenly move onto the highway. "[W]here the evidence leaves some doubt as to whether an emergency situation existed, there is a question of fact for the jury, and the jury should be instructed on *both* the assured clear distance ahead and sudden emergency doctrines. The dual instructions assures that the jury has the applicable law for whatever factual scenario they find occurred." *Papandrea v. Hartman,* 352 Pa.Super. 163, 170, 507 A.2d 822, 826 (1986) (emphasis in original). *See also Elder v. Orluck,* 334 Pa.Super. 329, 483 A.2d 474 (1984). Here, it was proper for the judge to instruct the jury on both doctrines; moreover, the instructions given on the doctrines were correct.

Additionally, appellant/Cervone contends the verdict was contrary to the law and evidence. At the outset we note appellant's post-verdict motion contains a mere boilerplate allegation in this regard. *See Jackson v. Spagnola,* 349 Pa.Super. 471, 503 A.2d 944 (1986). Even so, a review of the evidence belies appellant's assertion. "In reviewing a denial of a new trial where the appellant argues that the verdict was against the weight of the evidence, we must award a new trial only where the verdict is so contrary to the evidence as to shock this Court's sense of justice." *Bolus v. United Penn Bank,* 363 Pa.Super. 247, 259, 525 A.2d 1215, 1221 (1987). The attribution of 80% of the liability to Cervone does not shock this Court's sense of justice.

## II. DAMAGES

Appellants Reading and Schwan's urge this Court to find the trial court erred in refusing to grant their motion in

limine to exclude from evidence plaintiff's exhibits 12–19 which depicted appellee's open wound prior to and subsequent to a skin graft operation. We disagree. In *Fahringer v. Rinehimer*, 283 Pa.Super. 93, 423 A.2d 731 (1980), we said:

> The admission of photographs into evidence is within the discretion of the lower court. *Nyce v. Muffley*, 384 Pa. 107, 119 A.2d 530 (1956); *Piso v. Weirton Steel Co.*, 235 Pa.Super. 517, 345 A.2d 728 (1975). Merely because a photograph is gruesome is not a reason to exclude it. *Commonwealth v. Dickerson*, 406 Pa. 102, 176 A.2d 421 (1962). The court must consider whether the evidentiary value of the photograph outweighs the danger that it will upset the jury. Even when a witness has described an injury, a photograph may still have evidentiary value in that it may make the description more intelligible. *West v. Morgan*, 345 Pa. 61, 27 A.2d 46 (1942).

*Id.*, 283 Pa.Superior Ct. at 99, 423 A.2d at 734.

We affirm the trial court's admission of the photographs in question and we agree with its finding that while the pictures were not particularly pleasant, neither were they particularly gruesome.

■ Appellants Reading and Schwan's next argue the court erred in permitting plaintiff's exhibit 29, which they say was a synopsis of her possible injuries, to be taken by the jury for its consideration during deliberation. The trial court in its Opinion, however, says the appellants' description of the document is erroneous; in fact, it was a synopsis of the various categories of damages which would flow from plaintiff's injuries. As we noted in *Kearns v. Clark*, 343 Pa.Super. 30, 493 A.2d 1358 (1985), "The general rule in Pennsylvania is that exhibits properly admitted into evidence, with the exception of depositions and transcripts of testimony, may, within the discretion of the trial court, be sent out with the jury." *Id.*, 343 Pa.Superior Ct. at 38, 493 A.2d at 1362. At trial, appellants' counsel objected to both the admission of the exhibit and to its going out with the

jury (T.T. 2/11/85, pp. 364–65). He specifically stated that he was concerned the jury would take the 25 per cent disability figure given by Dr. McLamb and treat that figure as economic disability rather than anatomical disability. The judge responded:

We are overruling the objection to that portion of Exhibit 29 which simply is a list of the factors that should be considered and it's from incidental expenses up that we're permitting it to be used.

In regard to the argument, I have said that she may argue so long as she prefaces her arithmetic by saying something to the effect that if you find certain facts to be true. If you find that there is, if you find from the evidence a logical inference that there is some percentage of economic loss. I agree with Mr. Marnen that his testimony, from Dr. McLamb, Dr. McLamb's testimony was as to an anatomical. And whether that translates by inference to an economic percentage or not, I think is a jury question, and I'm going to let them decide that.

(T.T. at 367–68.) We find no abuse of discretion, especially in light of the fact that in his instructions, the judge charged the jury that the percentage of disability given was anatomical, and it was up to the jury to consider what impact that loss would have on appellee's economic horizon.

■ Reading and Schwan's additionally contend it was error for the court to permit Cheryl Cervone to testify that she had a miscarriage in March of 1982. She testified:

My doctors told me that they could not connect my leg to the loss of the pregnancy, there was nothing physically wrong with the baby, and my own mind, I attributed it to my leg, because I was off and on.

(T.T. 2/11/85, p. 305.)

After an objection by defense counsel, the judge permitted the testimony to stand saying it was "an expression of her mental state of mind, which goes into her pain and suffering." (T.T. at 306.) We find the judge abused his discretion when he overruled the objection. The testimony concerning the miscarriage was not proper for consideration

as an injury resulting from the accident, since even appellee admitted at trial that there was no causal connection between the miscarriage and her leg injuries. Likewise, the miscarriage was not a proper element of her pain and suffering as it occurred almost two years after the mishap.

■ Next, Reading and Schwan's urge the court erred in permitting appellee to present evidence of lost wages she incurred during her voluntary leave of absence for maternity in 1983. Mrs. Cervone testified she worked full-time following the March 1982 miscarriage, until she became pregnant again. Then, in January of 1983, the sixth month of this second pregnancy, she went to part-time status and subsequently, in February, took a leave of absence from the hospital because she was willing to risk her job or anything for this baby (T.T. at 314). She acknowledged she was aware that if she took a leave of more than twelve weeks, her job would not be held and she would receive the first available position for which she qualified (T.T. at 315). Counsel, on direct examination of Mrs. Cervone, then read part of a letter written by the employment manager where Mrs. Cervone had been employed during this time. Counsel read:

Because Mrs. Cervone had requested a six-month leave, her position was filled and was not available for her, to her August 4, she was told she would be notified as soon as an available position developed.

She was recalled for part-time work one day a week on January 12, 1984 and worked part-time until December 29, 1984, at which time a full-time position became available.

(T.T. at 316.) The trial judge admitted plaintiff's Exhibit 26a, and acknowledged defense counsel's dispute as to whether these damages were caused by the accident. This Court finds no damages for lost wages from February 1, 1983 until December 29, 1984 should have been submitted for the jury's consideration. Appellee failed to establish any connection between the lost wages and the accident. She testified she had taken the extended leave because she did not want to risk the baby, even for her job. Had she

introduced any evidence that the first miscarriage was caused by injuries she sustained in the accident and that she had reason to fear another miscarriage would result from those injuries, submission of the items of damage in question to the jury might have been proper. Where, however, appellee showed only that she had voluntarily taken a leave of absence which resulted in her loss of permanent employment, the matter should not have been put before the jury.

■ Lastly, appellants allege the court committed prejudicial error by permitting appellee's counsel to argue the jury could award future productivity increases to Cheryl Cervone. The statement objected to is as follows:

> Now that is the horizon; that's what she would earn over her working lifetime. You can decide that she would work for a less period of time. You can decide that perhaps you should increase based on some of the advances she might make. Whatever. But you determine over her lifetime how much if she hadn't been injured you think she would have earned. Now that's the base.

(T.T. at 386.) While counsel for neither appellant objected to the appellee's closing argument, counsel had previously objected to the admission of evidence bearing on damages for work advancement as no foundation had been established for such. (T.T. at 366.) Moreover, appellant Cervone raised the matter as error in his supplemental motion for post-trial relief. Regardless, since we are remanding the decision for a new trial as to damages, and because such comments likely influenced the jury verdict, we feel compelled to address the point. Speaking to damages for loss of future earnings, our Supreme Court in *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980) said:

> [I]n this Commonwealth, damages will be awarded for lost future earnings that compensate the victim to the full extent of the injury sustained. Upon proper foundation, the court shall consider the victim's lost future productivity.

*Id.*, 491 Pa. at 583, 421 A.2d at 1038.

In the case before us, such a foundation was not produced. Appellee Cheryl Cervone testified she was a trained

technician in ultrasound and x-ray, and had worked as a registered ultrasound sonographer at the time of the accident. (T.T. at 289.) There was no testimony adduced at trial that she would not be able to function in her occupation as a result of her injury or that her future capacity would be diminished. Thus, the comments made by counsel in closing argument with reference to loss of future earnings were not only improper but were most likely prejudicial to the appellants.

We reverse the judgment of the trial court and remand for a new trial limited to the issue of damages and in accordance with the foregoing Opinion.

Judgment reversed.

Jurisdiction relinquished.